UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARTHA PAULINO,                              :

                Plaintiff,           :          13 Civ. 3718 (AT) (AJP)

          -against-               :          **REPORT AND RECOMMENDATION**

CAROLYN W. COLVIN, Commissioner of           :
Social Security,
                             :

             Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Analisa Torres, United States District Judge:**

        Pro se plaintiff Martha Paulino brings this action pursuant to § 205(g) of the Social

Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social

Security (the "Commissioner") denying her Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") benefits.  (Dkt. No. 2: Compl.)   Presently before the Court is the

Commissioner's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No.

23: Notice of Motion.)  Paulino has not filed any brief or affidavit opposing the Commissioner's

motion, and the time to do so has passed.  (See Dkt. No. 19: 3/5/14 Order.)

        For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings (Dkt. No. 23) should be GRANTED.

**FACTS**

**Procedural Background**

        In December 2009 Paulino applied for DIB and SSI benefits, alleging that she was

disabled since August 1, 2009.  (Dkt. No. 14: Administrative Record filed by the Comm'r ("R.") 54,

104, 128.)  Paulino alleged disability due to arthritis in her knees, hypertension, leg and foot pain, anemia, high cholesterol, depression and a thyroid condition.  (R. 38-40, 133, 137-39.)  At the administrative hearing, she stressed that what affects her the most was her depression.  (R. 39-40.)  The Social Security Administration ("SSA") found that Paulino was not disabled, and denied the applications.  (R. 54-61.)  Paulino requested an administrative hearing.  (R. 62-64.)

Administrative Law Judge ("ALJ") Selwyn S. C. Walters conducted an administrative hearing on May 12, 2011.  (R. 32-53.)  On October 5, 2011, ALJ Walters issued a written decision finding that Paulino was not disabled.  (R. 7-19.)  ALJ Walters' decision became the Commissioner's final decision when the Appeals Council denied Paulino's request for review on April 17, 2013.  (R. 1-3, 6.)

The issue before the Court is whether the Commissioner's decision finding that Paulino is not disabled is supported by substantial evidence.

**<u>Non-Medical Evidence</u>**

Paulino, born in February 1958, was fifty-one years old at the alleged onset of her disability and fifty-three at the time of the ALJ hearing.  (R. 36.)  She attended school through the third grade in the Dominican Republic, her native country.  (R. 47, 134.)  She was unable to read, write or count in English.  (R. 47.)

From May through December 2002, Paulino worked performing seasonal park maintenance as part of a "Welfare" program.  (R. 50-51, 154.)  Her job involved cleaning the parks and doing housekeeping in the offices.  (R. 155.)  Paulino performed her work in a standing or walking position, and she lifted no more than ten pounds.  (R. 155.)  She worked forty hours over five days a week.  (R. 155.) From 2002 to 2009, Paulino worked selling pasteles, a type of taco, and as a babysitter, housekeeper and machine operator.  (R. 48-49, 154-58.)  In 2009, she worked

packing perfumes and making pasteles. (R. 48-49.) Paulino served meals to the elderly as a volunteer in 2010. (R. 48.)

Paulino stated that she could no longer work because she could not remain standing due to weakness in her legs, and that she could not bend her knees. (R. 38, 40.) She believed that she could sit "for some time" but could stand for no more than fifteen minutes, and could not walk "much." (R. 46.) She stated that she had high blood pressure, high cholesterol, anemia and abnormal thyroid levels. (R. 38.) Paulino explained that she was most significantly affected by depression, and specifically by crying spells that caused her to be sent home from work. (R. 38-41.) She stated that she was forgetful, had trouble sleeping and experienced moments where her mind "goes away." (R. 40, 51.) She said that her medications, Seroquel and Wellbutrin, help her sleep and reduce her crying spells. (R. 40-41.)

Paulino never was hospitalized and had no cardiac impairments resulting from her high blood pressure. (R. 45.) Paulino's doctor recommended treatment for her anemia, but Paulino lost her referral and did not keep her appointment. (R. 45-46.) She did not receive treatment for hypothyroidism. (R. 46.)

Paulino lived with her sixteen year old daughter and baby granddaughter. (R. 37-38.) Paulino got along well with her children. (R. 41.) Her daughter and son helped with various household chores, and Paulino cooked, washed the dishes, made her bed, swept the floor, dressed, attended to her personal hygiene and handled the mail. (R. 41-43, 144-46.) She took public transportation by herself. (R. 43, 146.) She grocery shopped approximately twice a month for an hour and a half at a time. (R. 147.) She spoke on the phone with family and friends and attended church every Sunday for three hours. (R. 44, 148.) She also spent time watching TV. (R. 147.)

Paulino spent the day attending to household needs, such as cooking, cleaning, laundry and ironing.  (R. 144, 146.)  The variety of foods she prepared decreased, but Paulino still cooked two to three hours every day.  (R. 145.)  Paulino took care of her granddaughter on weekends.  (R. 144.)

**Medical Evidence**

**2009**

**Montefiore**

On October 29, 2009, Paulino presented to the Montefiore Hospital emergency room with complaints of pain and swelling in her right ankle and leg for the past six months.  (R. 185-86.) She rated her pain a four out of ten on a ten-point scale.  (R. 185.)  She described the pain as mild and reported minimal dysfunction.  (R. 186.)  Upon examination, Paulino did not appear to be in acute distress.  (R. 187.)  There was tenderness and swelling of the lateral part of the right foot.  (R. 187.)  Paulino had pain with plantar flexion of the right foot.  (R. 187.)  Neurological examination of the right leg was normal.  (R. 187.)  The attending physician diagnosed arthralgia and discharged Paulino in good condition, with prescriptions for Percocet and Naprosyn.  (R. 188-89.)

**Bronx-Lebanon/Dr. Charles Pastor**

On December 8, 2009, Paulino was evaluated at the Bronx-Lebanon Hospital in connection with her FEGS Health and Human Services System ("FEGS") case.  (R. 227-37.)[1] Daylin Rosado, whose expertise is unidentified, reported that Paulino's blood pressure was 140/101. (R. 227.)  Dr. Charles Pastor took Paulino's medical history and conducted a physical examination.

---

[1]     FEGS is a non-profit organization that provides a variety of health and human services, including employment and workforce development, as well as disability and rehabilitation programs.  See http://www.fegs.org/about/about_fegs (last visited May 9, 2014).

(R. 229-31.) Paulino reported a history of bilateral leg pain, thyroid disease, thrombocytopenia, and "chol" (presumably a reference to high cholesterol). (R. 229.) She stated that her current medications were Percocet, Zocor and Naproxen. (R. 229.) She complained of pain in her knees and feet. (R. 231.) Paulino rated her current level of pain as a one and her worst pain as a three. (R. 245.) A level of zero was tolerable for her. (R. 245.) The report does not indicate whether this was a ten-point rating scale. (R. 245.)

Dr. Pastor indicated that there was peripheral edema, joint swelling, diminished ranges of motion, contractures and mild swelling of the feet. (R. 245.) He diagnosed bilateral leg pain, thyroid disease, thrombocytopenia, high cholesterol, high blood pressure, possible coronary artery disease and poor vision. (R. 232, 235, 237.) Dr. Pastor assessed that Paulino needed an accommodation for employment for limited walking, indicated that Paulino was "functional," and that she could participate in twenty-five hours of vocational services, and noted that in an eight-hour workday, Paulino could walk four to five hours and would have pain climbing. (R. 232, 246.) Dr. Pastor referred Paulino for a cardiology evaluation. (R. 232, 238.)

**Cardiology Evaluation**

On December 22, 2009, Paulino was seen for a cardiology evaluation. (R. 238-43.)[2] The report indicates that chest, respiratory, cardiovascular and musculoskeletal examinations were normal. (R. 239-40.) Paulino's pulses were normal. (R. 240.) The report diagnosed "ACP," "HPN," dyslipidemia and an abnormal EKG. (R. 241.) The report indicated that Paulino's condition was unstable and required a treatment plan before a functional assessment could be made. (R. 241.)

---

[2]     The name of the cardiologist does not appear on the report. (See R. 238-43.)

It recommended an "ETT" (a possible reference to an exercise tolerance test or an exercise treadmill test) and an echocardiogram.  (R. 241.)

### Depression Evaluation

At some point during the FEGS evaluation, an undated depression inventory was taken.  (R. 251-52.)  Paulino reported a history of depression, but she was not currently receiving any mental health services.  (R. 251.)  She denied suicidal and homicidal ideation, plan or intent, or current or a history of auditory or visual hallucinations.  (R. 251.)  Paulino scored an eleven on the PHQ-9 (a series of questions regarding recent depressive symptoms), indicating moderate depression.  (R. 252.)  She reported lack of interest, trouble sleeping, fatigue, poor appetite, low self-esteem and family issues.  (R. 252-53.)  She reported that she was caring for her fifteen-year-old daughter who had an unspecified illness.  (R. 252-53.)

### 2010

### Fordham-Tremont

### Julia Checo

On January 29, 2010, Paulino went to the Fordham-Tremont Community Health Center where social worker Julia Checo interviewed her.  (R. 263-70.)  Paulino reported a depressed mood, insomnia and feeling lonely.  (R. 263, 264.)  Paulino reported "no psychiatric history."  (R. 263-64, 270.)   Upon mental status evaluation, Paulino was well-dressed and groomed, and cooperative, alert and fully oriented.  (R. 263.)  She was forgetful.  (R. 263.)  Her speech and movements were normal.  (R. 263.)  Paulino denied suicidal or homicidal ideations or auditory or visual hallucinations.  (R. 263.)  Checo diagnosed depressive disorder not otherwise specified on Axis I; deferred diagnosis on Axis II; hypertension, hyperthyroid and hypercholesterol on Axis III;

unemployment on Axis IV; and a global assessment of functioning ("GAF") score of fifty.  (R. 263.)[3]

On February 24, 2010, Paulino was approved for treatment in Fordham-Tremont's mental health program.  (R. 279.)  Checo completed a Psychosocial History and Assessment, noting Paulino's report that she had felt anxious and depressed since immigrating to the United States in 1985.  (R. 264-70.)  Paulino reported that she was able to fully care for her daughter even though she was depressed, although she acknowledged that she had an "ACS" case because her daughter was not attending school on a regular basis.  (R. 265.)  She stated that she was treated at Montefiore Medical Group and that the only medications she took were high "cholesterol pills."  (R. 269.)  Checo reported an expected outcome of decreasing Paulino's depressive and anxiety symptoms by 75%.  (R. 270.)

**Dr. Albert Scublinsky**

On March 9, 2010, psychiatrist Dr. Albert Scublinsky completed a Psychiatric Rehabilitation Readiness Determination form.  (R. 277-78.)  Paulino was to participate in group therapy to increase her socialization and help her address her limited social contacts.  (R. 277, 279.)  Paulino stated she worked for FEGS and rated her level of satisfaction with this situation a "4" (on a five point scale), indicating that she was minimally dissatisfied.  (R. 277.)  Dr. Scublinsky

---

[3]     The multi axial system of analysis is used to assess a patient's physical and mental condition along five axes, each referring to a specific domain of information.  Axis I pertains to clinical disorders; Axis II pertains to personality disorders; Axis III pertains to general medical conditions; Axis IV pertains to environmental and psychosocial problems; and Axis V references the patient's GAF.  Diagnostic & Statistical Manual of Mental Disorders 27-34 (4th ed. rev. 2000).  A GAF of 50 indicates serious symptoms or serious difficulty in social, occupational, or school functioning.  See id. at 34.

recommended that Paulino seek work when her depression symptoms decreased. (R. 277.)  Paulino was to participate in individual counseling, and psychiatric evaluation was pending. (R. 279.)

On March 24, 2010, Dr. Scublinsky performed a psychiatric evaluation. (R. 271-76.) Paulino appeared clean and neat, her motor behavior was normal and she was friendly. (R. 273.) Her attention was fair, and she was alert and fully oriented. (R. 273.)  Her memory was normal, her speech was clear and her ability to name objects, comprehend and respond were good. (R. 273.) Her mood was depressed and her affect was constricted. (R. 273.)  Paulino's thought process productivity was low, continuity was normal and her ability to abstract was complete. (R. 274.)  In terms of thought content, Paulino had anxiety, but no delusions or other cognitive or perceptual abnormalities. (R. 274.)  Her intelligence was normal. (R. 274.)  She denied suicidal or homicidal ideation. (R. 274.)  She had good impulse control and fair insight. (R. 274.)  Her social judgment and relatedness were poor.  (R. 274.)  Dr. Scublinsky diagnosed major depressive disorder, recurrent, without psychotic features on Axis I; none on Axis II; hyperthyroidism, hypertension and hypercholesterol on Axis III; domestic abuse and lack of supports on Axis IV; and a GAF of fifty-one to sixty on Axis V. (R. 275-76.)  He prescribed Lexapro and Seroquel. (R. 282.)

On June 14, 2010, Paulino was seen for a subsequent FEGS interview. (R. 254.)  She reported that she had a primary care physician and was receiving mental health care. (R. 254.)  Her mood and affect were depressed. (R. 254.)  She denied current suicidal or homicidal ideations, plans or intent, or auditory or visual hallucinations. (R. 254.)  Her thoughts and speech were relevant, and she was oriented to process. (R. 254.)  She walked with a limp, but stated that she was able to travel alone. (R. 254, 255.)  She stated that she had sought emergency room treatment on several occasions for "nervous breakdown[s]." (R. 254.)

On June 16, 2010, Paulino's treatment team reviewed her treatment plan, and found that her GAF was fifty-three.  (R. 281-82.)  She participated in group therapy and medication management.  (R. 281.)  Her treatment at Fordham-Tremont was to continue.  (R. 283.)

On July 7, 2010, Dr. Scublinsky completed a Physician's Functional Assessment Form and Treating Physician's Wellness Plan Report for New York City's Human Resources Administration.  (R. 257-59.)  He diagnosed major depressive disorder without psychotic features.  (R. 257-59.)  Paulino's reported symptoms were "poor sleep, anxiety, crying spells, sadness, low motivation and hopelessness."  (R. 257-58.)  Dr. Scublinsky stated that Paulino was unable to work for at least twelve months because her "level of functioning" was "greatly impaired by her symptoms of depression."  (R. 257, 259.)  He therefore believed that she "need[ed] more time to improve her mental health and stabilize her symptoms."  (R. 257, 259.)

On September 15, 2010 and December 15, 2010, Paulino's treatment plan was reviewed at Fordham-Tremont.  (R. 284-87.)  Her GAF was fifty-three.  (R. 284-87.)  Paulino continued to participate in group and individual therapy and medication management for symptoms of depression.  (R. 284-85.)  No side effects from medication were reported.  (R. 287.)

**2011**

On March 9, 2011, Paulino's GAF was fifty-four.  (R. 288.)  She continued to participate in treatment and there were no side effects from medication.  (R. 288-89.)  On May 10, 2011, Ms. Rivera, a supervising social worker at Fordham-Tremont, confirmed that Paulino was in treatment.  (R. 260.)  On May 26, 2011, Paulino was cleared for continuing treatment at Fordham-Tremont.  (R. 290.)

**Consultative Physicians**

**Dr. Sharon Revan**

On February 4, 2010, Dr. Sharon Revan, an internist, examined Paulino. (R. 190-93.) Paulino reported a history of high cholesterol, hypertension, anemia and bilateral knee pain. (R. 190.) She complained of chest pain, occasional palpitations, edema in her legs and burning pain in her knees. (R. 190.) Paulino reported that her knee pain improved with laying down and medication and that physical therapy helped "a little." (R. 190.) She refused surgery. (R. 190.) She rated her pain at a level of six on a ten-point scale. (R. 190.) Paulino informed Dr. Revan that she showered and dressed independently, and cooked, cleaned, did laundry and shopped without any problems. (R. 191.)

On examination, Paulino's blood pressure was 130/80. (R. 191.) Her stance was normal; she had a slight limp and did not use an assistive device. (R. 191.) Paulino could walk on heels and toes without difficulty, and could squat halfway. (R. 191.) She did not need help changing or getting on and off the examination table, and she could rise from a chair without difficulty. (R. 191.)

Paulino's chest, lungs and heart were unremarkable. (R. 192.) An examination of her cervical spine showed full flexion, extension, lateral flexion and rotary movement. (R. 192.) Flexion of the lumbar spine was to seventy-five degrees. (R. 192.) A straight leg raising test was negative. (R. 192.) Paulino had full range of motion of both knees with pain and cracking sounds. (R. 192.) She had full range of motion of her shoulders, elbows, forearms, wrists, hips and ankles. (R. 192.) She had full strength in her arms and legs, her joints were stable and non-tender, and there was no redness, heat, swelling or effusion. (R. 192.) There were no reflex, motor or sensory

deficits.  (R. 192.)  There was no cyanosis, clubbing, edema or muscle atrophy in the extremities.  (R. 192.)  An x-ray of Paulino's left knee was negative.  (R. 192.)

Dr. Revan diagnosed high cholesterol, high blood pressure, anemia and bilateral knee pain.  (R. 193.)  She stated that due to knee pain, Paulino had mild limitations for walking distances, climbing stairs and standing.  (R. 193.)  Dr. Revan also stated that Paulino had no limitations of her abilities to sit or use her upper extremities for fine and gross motor activities.  (R. 193.)

### Dr. Dmitri Bougakov

On March 12, 2010, Dr. Dmitri Bougakov, a psychologist, evaluated Paulino.  (R. 199-202.)  Paulino complained of difficulty sleeping, poor appetite, a depressed mood, crying spells, loss of interest, low energy, difficulty concentrating, a diminished sense of pleasure, excessive apprehension and worry and forgetfulness, "for the last three years or so."  (R. 199.)

On examination, Paulino was cooperative and related adequately; her appearance and motor behavior were normal; her speech was fluent and clear; and her expressive and receptive language skills were adequate.  (R. 200.)  Her thought process was coherent and goal-directed.  (R. 200.)  Paulino's affect was full range and appropriate.  (R. 200.)  Her mood was neutral, her senses were clear, and she was oriented to person, place and date.  (R. 200.)  Paulino made errors on simple calculations and "serial 3s," due to a limited mathematical ability.  (R. 200.)  Her recent and remote memory skills were mildly impaired, and her intellectual functioning was in the average to below-average range.  (R. 200.)  Paulino's insight and judgment were fair.  (R. 201.)

Paulino reported that she could do all chores and uses public transportation independently.  (R. 201.)  She stated that she socialized with friends in church and had good family relationships.  (R. 201.)  Paulino's reported hobbies included watching television, listening to the radio, reading and attending church.  (R. 201.)

Dr. Bougakov diagnosed depressive and anxiety disorder, not otherwise specified. (R. 201.) He stated that Paulino did not present with significant vocational difficulties, other than mild difficulties learning new tasks and performing complex tasks. (R. 201.) He attributed these limitations in part to psychiatric symptomology and in part to Paulino's limited education. (R. 201.) He did not believe that Paulino's limitations were significant enough to interfere with her ability to function on a daily basis. (R. 201.) Dr. Bougakov assessed a fair prognosis given Paulino's lack of significant psychiatric treatment and relatively mild cognitive limitations. (R. 202.)

### State Agency Psychological Expert Dr. A. Hochberg

On March 24, 2010, State agency psychological expert Dr. A. Hochberg reviewed the evidence of record, including Dr. Bougakov's report and noted that Paulino had just started treatment with Ms. Rivera. (R. 223-25.) Dr. Hochberg concluded that Paulino could do "simple task work." (R. 225.)

### Vocational Expert Testimony

Vocational expert Raymond Edward Cestar testified at Paulino's May 12, 2011 hearing. (R. 51-53.) Cestar testified that Paulino had worked as a parks worker, which was medium exertion unskilled work with a specific vocational preparation time ("SVP") of two; babysitter, which was medium exertion with an SVP of two; assembler, which was light exertion with an SVP of two; packager, which was medium exertion with an SVP of two; and cleaner, which was light exertion with an SVP of two. (R. 51.)[4] ALJ Walters asked Cestar to discuss jobs for a hypothetical individual of Paulino's age, education and work experience, who could perform light work with occasional postural limitations. (R. 51.) Cestar responded that such an individual could perform

---

[4]     An SVP of one to two corresponds to unskilled work. See SSR 00-4p, 2000 WL 1898704 at *3 (Dec. 4, 2000).

Paulino's past work as a cleaner or assembler, which are light and unskilled.  (R. 51-52.)  ALJ Walters asked Cestar to further assume that the hypothetical individual could perform only simple, routine and repetitive tasks in an environment free from fast-paced production requirements, involving only simple work-related decisions and few workplace changes, only occasional contact with coworkers and supervisors and no interaction with the public.  (R. 52.)  Cestar responded that such an individual could still perform the job of cleaner or assembler.  (R. 52.)  In addition, such an individual could work as a cafeteria attendant, photocopy machine operator or mail clerk, all of which are light jobs available in the New York area.  (R. 52-53.)

## ALJ Walters' Decision

On October 5, 2011, ALJ Walters issued a written decision denying Paulino's application for DIB and SSI benefits.  (R. 17-19.)

ALJ Walters conducted a five-step analysis, considering Paulino's testimony and the medical record.  (R. 13-19.)  First, ALJ Walters found that Paulino had not engaged in substantial gainful activity since her alleged onset date of August 1, 2009.  (R. 15.)  Second, he determined that Paulino had the following severe impairments: hypertension, bilateral knee pain, recurrent major depressive disorder without psychotic features and anxiety disorder.  (R. 15.)  Third, ALJ Walters found that Paulino did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (R. 15-16.)  ALJ Walters determined that Paulino retained the residual functional capacity to perform light work with occasional postural limitations, that requires no interaction with the public, and only occasional interaction with coworkers and supervisors.  (R. 16.)  He also limited Paulino to simple, routine, repetitive tasks in a work environment free from fast-paced requirements, involving only simple work-related decisions, and few, if any workplace changes.  (R. 16-17.)

At the fourth step, ALJ Walters determined that, in light of Paulino's residual functional capacity and other vocational factors,  Paulino was able to perform light work including her past relevant work as a cleaner.  (R. 16, 18.)  ALJ Walters concluded that Paulino "has not been under a disability, as defined in the Social Security Act, from August 1, 2009, through the date of [the] decision," October 5, 2011.  (R. 19.)

On April 17, 2013, the Appeals Council denied Paulino's request for review of ALJ Walters' decision and it became the Commissioner's final decision.  (R. 1-3, 6.)

## ANALYSIS

## I.    THE APPLICABLE LAW

### A.    Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[5/]

---

[5/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (continued...)

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[6/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[7/]

B.   **Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011); Green-

---

[5/]    (...continued)
(2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[6/]    See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[7/]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

<u>Younger</u> v. <u>Barnhart</u>, 335 F.3d 99, 105-06 (2d Cir. 2003).[8/]  "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'"  <u>Morris</u> v. <u>Barnhart</u>, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[9/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  <u>Richardson</u> v. <u>Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); <u>accord</u>, <u>e.g.</u>, <u>Selian</u> v. <u>Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 773-74.[10/]  "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence."  <u>Rutherford</u> v.

---

[8/]  See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

[9/]  See also, e.g., Karle v. Astrue, 12 Civ. 3933, 2013 WL 2158474 at *9 (S.D.N.Y. May 17, 2013) (Peck, M.J.), report & rec. adopted, 2013 WL 4779037 (S.D.N.Y. Sept. 6, 2013); Santiago v. Astrue, 11 Civ. 6873, 2012 WL 1899797 *13 (S.D.N.Y. May 24, 2012) (Peck, M.J.); Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 13, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[10/]  See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The

Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if

it might justifiably have reached a different result upon a de novo review.'"  Jones v. Sullivan, 949

F.2d 57, 59 (2d Cir. 1991).[11]

> The Court, however, will not defer to the Commissioner's determination if it is "'the

product of legal error.'"  E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y.

Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir.

2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101

(2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

> The Commissioner's regulations set forth a five-step sequence to be used in

evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540

U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct.

2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> > Acting pursuant to its statutory rulemaking authority, the agency has promulgated
> > regulations establishing a five-step sequential evaluation process to determine
> > disability.  If at any step a finding of disability or non-disability can be made, the
> > SSA will not review the claim further.  [1] At the first step, the agency will find
> > nondisability unless the claimant shows that he is not working at a "substantial
> > gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant
> > shows that he has a "severe impairment," defined as "any impairment or combination
> > of impairments which significantly limits [the claimant's] physical or mental ability
> > to do basic work activities."  [3] At step three, the agency determines whether the
> > impairment which enabled the claimant to survive step two is on the list of
> > impairments presumed severe enough to render one disabled; if so, the claimant
> > qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to
> > step four, at which the SSA assesses whether the claimant can do his previous work;
> > unless he shows that he cannot, he is determined not to be disabled.  [5] If the
> > claimant survives the fourth stage, the fifth, and final, step requires the SSA to

---

[11]    See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312
F.3d at 586.

consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[12/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training. See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[13/]

## II.   APPLICATION OF THE FIVE-STEP SEQUENCE TO PAULINO'S CLAIM

### A.   Paulino Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Paulino was engaged in substantial gainful activity after her application for DIB and SSI benefits. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510. Since ALJ Walters' conclusion that Paulino did not engage

---

[12/]   See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335 F.3d at 106; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[13/]   See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d at 106; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

in substantial gainful activity during the applicable time period (see page 13 above) benefits Paulino, the Court proceeds to the second step of the five-step analysis.

**B.      Paulino Demonstrated "Severe" Impairments That Significantly Limited Her Ability To Do Basic Work Activities**

The second step of the analysis is to determine whether Paulino proved that she had a severe impairment or combination of impairments that "significantly limit[ed her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6). The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). "[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" McDowell v. Colvin, No. 11-CV-1132, 2013 WL 1337132 at *6 (N.D.N.Y. Mar. 11, 2013), report & rec. adopted, 2013 WL 1337131 (N.D.N.Y. Mar. 29, 2013).[14/]

_____

[14/]   Accord, e.g., Whiting v. Astrue, No. Civ. A. No. 12-274, 2013 WL 427171 at *2 (N.D.N.Y. Jan. 15, 2013) ("'The mere presence of a disease or impairment alone . . . is insufficient to establish disability; instead, it is the impact of the disease, and in particular any limitations it may impose upon the claimant's ability to perform basic work functions, that is pivotal to the disability inquiry.'"), report & rec. adopted, 2013 WL 427166 (N.D.N.Y. Feb. 4, 2013); Lohnas v. Astrue, No. 09-CV-685, 2011 WL 1260109 at *3 (W.D.N.Y. Mar. 31, 2011), aff'd, 510 F. App'x 13 (2d Cir. 2013); Hahn v. Astrue, 08 Civ. 4261, 2009 WL 1490775 at *7 (S.D.N.Y. May 27, 2009) (Lynch, D.J.) ("[I]t is not sufficient that a plaintiff 'establish[]
(continued...)

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process."  Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999).  On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken.  See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

ALJ Walters determined that the medical evidence indicated that Paulino had the severe impairments of hypertension, bilateral knee pain, recurrent major depressive disorder without psychotic features and anxiety disorder.  (See page 13 above.)  ALJ Walters' finding regarding the severity of Paulino's impairments benefits Paulino and the Court therefore proceeds to the third step of the five-part analysis.

**C.   Paulino Did Not Have A Disability Listed In Appendix 1 Of The Regulations**

The third step of the five-step test requires a determination of whether Paulino had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is

---

14/        (...continued)
the mere presence of a disease or impairment.'  Rather, 'the disease or impairment must result in severe functional limitations that prevent the claimant from engaging in any substantial gainful activity.'" (citation omitted)); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) ("The mere presence of a disease or impairment is not disabling within the meaning of the Social Security Act.").

conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

First, ALJ Walters found that neither Paulino's "knee pain nor her hypertension have been causing enough symptoms to meet or equal any impairment defined and described in the Listings."  (R. 15; see page 13 above.)  With respect to Paulino's bilateral knee pain, Section 1.02 outlines the conditions required to establish disorders of the joint.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02.  To constitute an Appendix 1 listed impairment, Paulino's bilateral knee pain must qualify as "[m]ajor dysfunction of a joint(s)," characterized by:

> gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02 (emphasis added).

Under Section 1.03, impairment can also arise from:

> Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.03 (emphasis added).

"Inability [t]o ambulate effectively" means:

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1).  "To ambulate effectively,"

individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).

The evidence clearly showed that Paulino could ambulate effectively—she did not use an assistive device and she carried out routine ambulatory activities such as cleaning, shopping and taking public transportation independently.  (See pages 3-4, 10-11 above.)  Paulino therefore did not prove that her knee impairment impacted her ability to ambulate to the extent required by the Listings.  See, e.g., Hilliard v. Colvin, 13 Civ. 1942, 2013 WL 5863546 at *13 (S.D.N.Y. Oct. 31, 2013) (Peck, M.J.) ("evidence clearly showed that [claimant] could ambulate effectively" where "she used only one cane (not two)"); DiPalma v. Colvin, 951 F. Supp. 2d 555, 571-72 (S.D.N.Y. 2013) (Peck, M.J.) (claimant who "continuously reported right knee pain" and "walked with a limp" could ambulate effectively where he "testified before the ALJ that he carried out activities of daily living" and his doctor "noted that [claimant] used no assistive device"); Richardson v. Astrue, 10 Civ. 9356, 2011 WL 2671557 at *9 (S.D.N.Y. July 8, 2011) (Peck, M.J.) (claimant who took "public transportation without assistance," "climb[ed] stairs," and "perform[ed] various household chores" could ambulate effectively, even though he "walked with a Trendelenburg gait" and "his ability to ambulate was moderately to severely impaired" (quotations omitted)), report & rec. adopted, 2011 WL 3477523 (S.D.N.Y. Aug. 8, 2011); Paulino v. Astrue, 08 Civ. 02813, 2010 WL 3001752 at *15 (S.D.N.Y. July 30, 2010) (Peck, M.J.) (claimant that "limped slowly [to] avoid[ ] pressure on [her]

right ankle and had moderate limitations in walking long distances," could ambulate effectively because she walked "without any assistive device," and was able to climb stairs "to her fourth floor apartment (albeit slowly) and travel by bus and taxi without assistance" (citations & quotations omitted); Dibiasio v. Astrue, No. 08-CV-0743, 2010 WL 3368429 at *10 (W.D.N.Y. June 10, 2010) (claimant who "made short trips to the store, performed light household chores like laundry, gardening, vacuuming and meal preparation, and was able to travel short distances without a cane" could ambulate effectively), report & rec. adopted, 2010 WL 3368358 (W.D.N.Y. Aug. 23, 2010); Marullo v. Astrue, No. 08-CV-0818, 2010 WL 2869577 at *9 (W.D.N.Y. May 4, 2010) (claimant's testimony that she takes "Tylenol for knee pain, has difficulty walking long distances . . . and has to sit when she experiences pain in her legs . . . without more, . . . does not rise to the definition of ineffective ambulation" (citations omitted)), report & rec. adopted, 2010 WL 2869574 (W.D.N.Y. July 20, 2010); Rosado v. Astrue, 713 F. Supp. 2d 347, 360 (S.D.N.Y. 2010) (Peck, M.J.) (claimant who "had full range of motion in his ankles," "did not require an assistive device to walk," did "his own shopping and [made] social visits to his son's home" was able to ambulate effectively).[15/]

---

[15/]   See also, e.g., Serrano v. Astrue, 08 Civ.1920, 2009 WL 959557 at *10 (S.D.N.Y. Mar. 16, 2009) (claimant could ambulate effectively because she "was able to use public transportation, do her own shopping, climb steps to enter and exit her apartment, and walk several blocks, albeit with breaks"); Alcantara v. Astrue, 667 F. Supp. 2d 262, 275 (S.D.N.Y. 2009) (claimant with a "'mild limitation' of her ability to walk" failed to demonstrate her inability to ambulate, because she "was able to walk without difficulty on her heels" and "had a full range of motion"); Guy v. Astrue, 615 F. Supp. 2d 143, 161 (S.D.N.Y. 2009) (although claimant "experienced some discomfort when walking," he could ambulate effectively because he indicated that he was able to walk short distances comfortably with a cane); Munn v. Comm'r of Soc. Sec., No. 06-CV-231, 2008 WL 2242654 at *8 (N.D.N.Y. May 29, 2008) (claimant who was able to complete daily activities independently, such as shopping and socializing with family and friends, dismount the examination table without assistance during appointments, and walk without assistive devices, although she used a cane occasionally, could ambulate effectively).

The same is true for Paulino's hypertension.  Hypertension is evaluated under Section 4.00 of Appendix 1, as explained in a section entitled "Evaluating Other Cardiovascular Impairments":

> Because hypertension (high blood pressure) generally causes disability through its effects on other body systems, we will evaluate it by reference to the specific body system(s) affected (heart, brain, kidneys, or eyes) when we consider its effects under the listings.  We will also consider any limitations imposed by your hypertension when we assess your residual functional capacity.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00(H)(1).

During the period in question, there is limited evidence that Paulino's hypertension restricted her lifestyle.  Although Dr. Pastor noted in his December 8, 2009 report that Paulino had high blood pressure and referred her for a cardiology evaluation (see page 5 above), the evaluation report showed that Paulino's chest, respiratory, cardiovascular and musculoskeletal examinations were normal, and there is no indication in the record that the additional testing recommended in the cardiology evaluation ever was conducted.  (See pages 5-6 above.)  Moreover, Paulino never was hospitalized and had no cardiac impairments resulting from her high blood pressure.  (See page 3 above.)  Additionally, Paulino testified that she could engage in a range of daily activities, including household chores, personal hygiene and socialization.  (See pages 3-4 above.)  Because there is no evidence that Paulino's hypertension significantly affected her heart or other body systems, and because she could participate in a variety of non-strenuous activities, ALJ Walters correctly concluded that it was not disabling.  See, e.g., Mejia v. Astrue, 719 F. Supp. 2d 328, 341-42 (S.D.N.Y. 2010) (Peck, M.J.) (hypertension did not satisfy Appendix 1 where there was "limited evidence that [claimant's] hypertension restricted his lifestyle" and he "testified that he could engage in a range of daily activities, including household chores, personal hygiene and socialization"); Garner v. Astrue, 08 Civ. 6367, 2009 WL 903742 at *17 (S.D.N.Y. Apr. 6, 2009) (Peck, M.J.)

(hypertension did not satisfy Appendix 1 where there was no evidence that it "produce[d] any effects (primary or secondary) that severely impaired other bodily systems"), report & rec. adopted in part, 2009 WL 1911744 (S.D.N.Y. June 30, 2009); Anderson v. Astrue, 07 Civ. 7195, 2008 WL 655605 at *14 (S.D.N.Y. Mar. 12, 2008) (Peck, M.J.), report & rec. adopted, 2008 WL 2463885 (S.D.N.Y. June 18, 2008); Nunez v. Barnhart, 05 Civ. 9221, 2007 WL 313459 at *6-7 (S.D.N.Y. Feb. 1, 2007) (plaintiff's hypertension was asymptomatic, controlled by medication, and did not affect plaintiff's ability to perform basic work activities); Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *15 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.) (plaintiff's hypertension not disabling where it was under control due to medication), report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sept. 12, 2006); Lowe v. Barnhart, 04 Civ. 9012, 2006 WL 1911020 at *7-8 (S.D.N.Y. July 10, 2006) (plaintiff's hypertension not a severe impairment where controlled through medication and plaintiff could perform a variety of daily activities); Tillackdharry v. Barnhart, 05 Civ. 6639, 2006 WL 903191 at *5 (S.D.N.Y. Apr. 10, 2006) (plaintiff's hypertension not disabling where controlled by medication and he had the residual functional capacity to perform a significant range of light work).

Second, ALJ Walters found that "[t]he severity of [Paulino's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04." (R. 16; see page 13 above.)  In order to qualify for a disability, Paulino's depression must qualify as an affective disorder or anxiety related disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.

Section 12.04 defines affective disorder, as an impairment:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.  Medically documented persistence, either continuous or intermittent, of one of the following:

1.  Depressive syndrome characterized by at least four of the following:

a.  Anhedonia or pervasive loss of interest in almost all activities; or

b.  Appetite disturbance with change in weight; or

c.  Sleep disturbance; or

d.  Psychomotor agitation or retardation; or

e.  Decreased energy; or

f.  Feelings of guilt or worthlessness; or

g.  Difficulty concentrating or thinking; or

h.  Thoughts of suicide; or

i.  Hallucinations, delusions, or paranoid thinking; or

2.  Manic syndrome . . . :

. . .

or

3.  Bipolar syndrome . . . ;

AND

B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration;

OR

C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.  Repeated episodes of decompensation, each of extended duration; or

2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

Similarly, section 12.06 describes conditions required to demonstrate anxiety-related

disorders:

In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A.  Medically documented findings of at least one of the following:

1.  Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a.  Motor tension; or

b.  Autonomic hyperactivity; or

c.  Apprehensive expectation; or

d.  Vigilance and scanning;

or

2.  A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3.  Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4.  Recurrent obsessions or compulsions which are a source of marked distress; or

5.  Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

ALJ Walters determined that Paulino suffers from recurrent major depressive disorder without psychotic features and an anxiety disorder, not otherwise specified.  (R. 15; see page 13 above.)  Presumably, that means that ALJ Walters found that Paulino satisfied § 12.04(A) and § 12.06(A).

With regard to the B criteria for the above disorders, however, ALJ Walters found that Paulino's "mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration."  (R. 16.)

Specifically, ALJ Walters determined that Paulino had no restriction in activities of daily living, only mild difficulties in social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration.  (R. 16.)  ALJ Walters also determined that Paulino failed to meet the C criteria because there was no evidence that her "condition prevents her from being able to function outside of her home or from being able to cope with some changes in the workplace."  (R. 16.)

ALJ Walters' findings are supported by the objective medical evidence.  ALJ Walters relied "in large part" on the psychological reports from Dr. Bougakov and Dr. Hochberg.  (R. 16.)  Consultative psychologist Dr. Bougakov found that Paulino's appearance and motor behavior were normal, her thought process was coherent and goal-directed, and her insight and judgment were fair.  (See page 11 above.)  Dr. Bougakov noted that Paulino stated that she did chores, used public transportation, socialized and had hobbies.  (See page 11 above.)  While Dr. Bougakov indicated that Paulino had mild difficulties learning new tasks and performing complex tasks, he partially attributed those limitations to her poor education, and concluded that Paulino's vocational difficulties were not significant enough to interfere with her ability to function on a daily basis.  (See page 12 above.)  Review psychologist Dr. Hochberg determined, based in part on Dr. Bougakov's report, that Paulino was able to do simple task work.  (See page 12 above.)  Additionally, Paulino's testimony and statements to doctors show that she maintains her personal hygiene, cleans her house, cooks (sometimes for hours at a time), cares for her baby granddaughter, and takes public transportation independently, indicating her ability to function outside of a "highly supportive living arrangement" and to adjust to the demands of daily activities.  (See pages 3-4, 10-11 above.)

Accordingly, substantial evidence supports ALJ Walters' determination that Paulino's mental impairments did not satisfy the listing requirements.  See, e.g., Paulino v. Astrue, 2010 WL

3001752 at *20-21 (substantial evidence supports ALJ determination that mental impairment did not meet § 12.04 listing requirements where review psychologist determined claimant "had moderate difficulties in maintaining concentration, but only mild restriction of daily activities and mild difficulties in maintaining social functioning" and where claimant "testified that she can feed, bathe, and dress herself, and use certain forms of transportation independently"); Rosado v. Astrue, 713 F. Supp. 2d at 364 (substantial evidence supports ALJ determination that mental impairment did not meet § 12.04 or § 12.06 listing requirements where psychiatrist noted claimant's independence and claimant's "own testimony and actions demonstrate his ability to function independently outside the area of his home"); Gibbs v. Astrue, 07 Civ. 10563, 2008 WL 2627714 at *20-21 (S.D.N.Y. July 2, 2008) (Peck, M.J.) (substantial evidence supports ALJ determination that mental impairment did not meet § 12.04 or § 12.06 listing requirements where doctor noted claimant "had no restrictions of activities of daily living" or "social functioning," and where claimant testified that she cooks, shops, "helps her children with their homework," and uses public transportation, which showed she "could function independently outside the area of her home"), report & rec. adopted, 2008 WL 4620203 (S.D.N.Y. Oct. 16, 2008).

Because ALJ Walters' finding that Paulino's impairments do not meet or medically equal the listed conditions is supported by substantial evidence, the Court proceeds with the five-step analysis.

Before proceeding to step four, however, the Court will address ALJ Walters' credibility and residual functional capacity determinations.

### 1.   **Credibility Determination**

Because subjective symptoms like pain only lessen a claimant's residual functional capacity ("RFC") where the symptoms "'can reasonably be accepted as consistent with the objective

medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.'  Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.").[16]  In

---

[16]  See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment,
(continued...)

addition, "courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[17/]

ALJ Walters considered Paulino's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and determined that Paulino's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Paulino's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment."  (R. 17-18.)[18/]

---

[16/]    (...continued)
in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[17/]    Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

[18/]    This Court, and others, previously have criticized ALJ decisions that "[d]etermin[e] the RFC first and then measur[e] the claimant's credibility by that yardstick," as "illogical" and "prejudicial to the claimant." Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *15-16 (S.D.N.Y. July 2, 2013) (Peck, M.J.) (& cases cited therein), report & rec. adopted, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014); see also, e.g., Givens v. Colvin, 13 Civ. 4763, 2014 WL 1394965 at *10 n.18 (S.D.N.Y. Apr. 11, 2014) (Peck, M.J.).  Nevertheless, while ALJ Walters' language leaves something to be desired, here unlike in Cruz, he gave sufficient explanation for finding Paulino's claim of disabling knee pain and depression to lack credibility—including careful review of the contrary medical evidence and Paulino's candid admissions that her activities of daily living largely have not been impacted by her medical impairments—that the Court concludes the ALJ's finding is supported by substantial
(continued...)

When ruling that a claimant is not entirely credible, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p, 1996 WL 374186 at *4 (July 2, 1996). The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about his impairments, his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted).[19]

ALJ Walters properly applied this two-step process to Paulino's case. (R. 17-18.) First, ALJ Walters assessed Paulino's credibility by considering all of the relevant medical evidence in the record. (R. 14.) Specifically, the ALJ found that the record reflected that Paulino's depression, which she claimed to be the condition that most affected her, caused "primarily psychological" symptoms consisting of "poor sleep, anxiety, crying spells, sadness, low motivation and hopelessness." (R. 18; see pages 9, 13 above.) ALJ Walters noted that Paulino's symptoms were being treated with medication and outpatient therapy, and that none of the consulting or

---

[18]   (...continued)
evidence and a remand is not called for. See, e.g., Givens v. Colvin, 2014 WL 1394965 at *10 n.18.

[19]   Accord, e.g., Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013); Campbell v. Astrue, 465 F. App'x at 7; Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-7p, 1996 WL 374186 at *2.

reviewing psychologists determined that these symptoms caused any significant limitations.  (See pages 7-9, 13 above.) Second, ALJ Walters found that the evidence showed that Paulino's "activities of daily living haven't changed too radically because of the impact of her medical impairments," and noted that Dr. Hochberg had reviewed the medical record and concluded that Paulino "had normal activities of daily living, performed household chores, cooked, did laundry and ironing, managed her money, took public transportation, socialized with friends in her church and had good family relationships."  (R. 17-18; see pages 12-13 above.)

Thus, ALJ Walters met his burden in finding Paulino's claims not entirely credible because the objective medical evidence failed to support her claims of disability based primarily on her depression.  See, e.g., Hilliard v. Colvin, 13 Civ. 1942, 2013 WL 5863546 at *15 (S.D.N.Y. Oct. 31, 2013) (Peck, M.J.) (The "ALJ . . . met his burden in finding [plaintiff's] claims not entirely credible because she remains functional in terms of activities of daily living and the objective medical evidence fails to support her claims of total disability based on pain." (citations omitted)); see also, e.g., Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010) (the court will not "second-guess the credibility finding . . . where the ALJ identified specific record-based reasons for his ruling"); Rutkowski v. Astrue, 368 F. App'x 226, 230 (2d Cir. 2010) (ALJ adequately supported credibility finding when he noted that "substantial evidence existed showing that [plaintiff] was relatively 'mobile and functional,' and that [plaintiff's] allegations of disability contradicted the broader evidence"); Givens v. Colvin, 2014 WL 1394965 at *10-11 (ALJ properly found claimant's disability claims not entirely credible where claimant "admitted that he was capable of performing many day-to-day activities, such as reading, watching television, caring for his personal needs, using public transportation, and going to church"); Ashby v. Astrue, 11 Civ. 2010, 2012 WL 2477595 at *15 (S.D.N.Y. Mar. 27, 2012) ("in making his credibility assessment, the ALJ appropriately

considered Plaintiff's ability to engage in certain daily activities as one factor, among others suggested by the regulations"), report & rec. adopted, 2012 WL 2367034 (S.D.N.Y. June 20, 2012).

### 2.      Residual Functional Capacity Determination

ALJ Walters found that Paulino "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant faces occasional postural limitations and can only perform isolated work not requiring any interaction with the public and only requiring no more than occasional interaction with coworkers or supervisors that is limited to simple, routine and repetitive tasks in a work environment free of fast-paced production requirements involving only simple, work-related decisions with few, if any, work place changes." (R. 16-17.)  In making this determination, ALJ Walters considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  (R. 17.)

ALJ Walters' conclusion is supported by consultative psychologist Dr. Bougakov, who noted that Paulino had only "a mild difficulty in learning new tasks and in performing complicated tasks."  (R. 17; see page 12 above.)  ALJ Walters also afforded proper weight to treating psychiatrist Dr. Scublinsky's records, which noted that Paulino's depression was being treated with medication and therapy.  (See pages 7-9 above.)  Although Dr. Scublinsky stated on July 7, 2010 that Paulino was unable to work for at least twelve months because her depression symptoms impaired her level of functioning, ALJ Walters was not required to give that opinion controlling weight, particularly where, as here, it is inconsistent with the other medical evidence showing that Paulino's limitations were mild.  (See page 9 above.)  Even though "the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where . . . the treating

physician issued opinions that are not consistent with other substantial evidence in the record, such

as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)

(citation omitted).[20]   Furthermore, "the opinion of a treating physician, or any doctor, that the

claimant is 'disabled' or 'unable to work' is not controlling," since such statements are not medical

opinions, but rather "opinions on issues reserved to the Commissioner." Mack v. Comm'r of Soc.

Sec., 12 Civ. 186, 2013 WL 5425730 at *8 (S.D.N.Y. Sept. 27, 2013); 20 C.F.R. §§ 404.1527(d)(1),

416.927(d)(1).[21]

Accordingly, the Court finds that ALJ Walters' assessment that Paulino had the

capacity to perform light work, with certain exceptions for the mild limitations caused by her mental

impairments—i.e., that she "can only perform isolated work not requiring any interaction with the

public and only requiring no more than occasional interaction with coworkers or supervisors that

is limited to simple, routine and repetitive tasks in a work environment free of fast-paced production

---

[20]   Accord, e.g., Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011); Kennedy v. Astrue, 343
F. App'x 719, 721 (2d Cir. 2009); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)
("While the opinions of a treating physician deserve special respect, they need not be given
controlling weight where they are contradicted by other substantial evidence in the record."
(citations omitted)); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("When other
substantial evidence in the record conflicts with the treating physician's opinion, however,
that opinion will not be deemed controlling.  And the less consistent that opinion is with the
record as a whole, the less weight it will be given."); Jimenez v. Astrue, 12 Civ. 3477, 2013
WL 4400533 at *10 (S.D.N.Y. Aug. 14, 2013) ("[T]he opinions of a treating physician 'need
not be given controlling weight where they are contradicted by other substantial evidence
in the record.'"); Van Dien v. Barnhart, 04 Civ. 7259, 2006 WL 785281 at *9 (S.D.N.Y. Mar.
24, 2006) ("[The] general rule of deference does not apply where 'the treating physician
issued opinions that are not consistent with other substantial evidence in the record, such
as opinions of other medical experts.'").

[21]   See also, e.g., Roma v. Astrue, 468 F. App'x 16, 18 (2d Cir. 2012); Priel v. Astrue, 453 F.
App'x 84, 86 (2d Cir. 2011); Snell v. Apfel, 177 F.3d at 133; Cruz v. Colvin, 12 Civ. 7346,
2013 WL 3333040 at *17 (S.D.N.Y. July 2, 2013) (Peck, M.J.), report & rec. adopted, 2014
WL 774966 (S.D.N.Y. Feb. 21, 2014).

requirements involving only simple, work-related decisions with few, if any, work place changes" (see pages 13, 35 above)—and by her physical impairments—i.e., that she "faces occasional postural limitations"—is supported by substantial evidence.

### D. **Paulino Had the Ability to Perform Her Past Relevant Work as a Cleaner**

The fourth prong of the five part analysis is whether Paulino had the residual functional capacity to perform her past relevant work, that is, her work as a cleaner or assembler. (See page 17 above.)  The vocational expert classified Paulino's past work experience as a cleaner and assembler as "light" work activity.  (R. 51; see page 12 above.)  ALJ Walters found that Paulino had the residual functional capacity to perform light work (see page 13 above), a conclusion supported by the vocational expert's hearing testimony (R. 51-52).  "Light work" is defined as "involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).

Substantial medical and functional capacity evidence supported ALJ Walters' conclusion that Paulino was capable of resuming her former employment as a cleaner.  (R. 17-18.) Although Paulino indicated that her job as a cleaner required her to stoop, kneel and crouch often (see R. 155), her burden at the fourth step is "to show an inability to return to her previous specific job and an inability to perform past relevant work generally."  Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003); accord, e.g., Petrie v. Astrue, 412 F. App'x 401, 409 (2d Cir. 2011) ("Under the fourth step of the five-step analysis, 'the claimant has the burden to demonstrate an inability to return to h[is] previous specific job and an inability to perform h[is] past relevant work generally.' This inquiry 'requires separate evaluations of the previous specific job and the job as it is generally

performed.'" (citation omitted)).  "The Dictionary of Occupational Titles ('DOT') is used to evaluate jobs as they are generally performed."  Petrie v. Astrue, 412 F. App'x at 409; accord, e.g., Jasinski v. Barnhart, 341 F.3d at 185.

      The vocational expert testified that Paulino could perform her past work as a cleaner "as actually performed" and "as generally performed in the national economy," which is consistent with the DOT classification of the job as "light, SVP[] 2" work.  (R. 51-52; see R. 18.)  Accordingly, the ALJ properly concluded that Paulino's past work as a cleaner "does not require the performance of work related activities precluded by the claimant's residual functional capacity."  (R. 18.)  See, e.g., Grogg v. Comm'r of Soc. Sec., 11 Civ. 1381, 2014 WL 1312325 at *13 (N.D.N.Y. Mar. 31, 2014) ("The DOT classifies the position of parking lot attendant as 'light work.' . . . The DOT classifications, therefore, establish that Plaintiff's past relevant work as a parking lot attendant, as generally performed, is a light work position.  Accordingly, the ALJ properly found that Plaintiff's ability to perform light work enables her to perform her past relevant work as a parking lot attendant as generally performed, and the Plaintiff failed to satisfy her burden of proving that she cannot perform this past relevant work.  Because the ALJ's finding that Plaintiff could perform this past relevant work as a parking lot attendant as generally performed is sufficient to negate a finding of disability at step four, it is not necessary for the Court to determine whether Plaintiff could perform her past relevant work as actually performed." (citations omitted)); Alfaro v. Astrue, 09 Civ. 3756, 2011 WL 6259132 at *8 (S.D.N.Y. Dec. 6, 2011) ("Given that the vocational expert 'testified that a claimant with the above-mentioned residual functional capacity could perform work as an office clerk [and] light SVP 3 work,' the ALJ concluded that [plaintiff] is likewise capable of performing her past relevant work as an office clerk.  The ALJ noted that her work 'does not require the performance of work-related activities precluded by the claimant's residual functional capacity.'

Therefore, the ALJ determined that [plaintiff] was not disabled under the Act and did not qualify for SSI benefits." (citations omitted)).[22]

Because Paulino did not meet her burden of proof on the fourth step of the analysis, the Court is not required to advance to the fifth step. See 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step.").[23]  Even if the Court were to proceed to step 5, however, ALJ Walters' conclusion is supported by substantial evidence, including the testimony of a vocational expert.  (See pages 12-13 above.)[24]

---

[22]  Because this conclusion is supported by the record, it is not reversible error that ALJ Walters' conclusion states only that Paulino was able to perform her past work as "it was actually performed."  (R. 18.)  See, e.g., Roman Jimenez v. Colvin, 12 Civ. 6001, 2014 WL 572721 at *15 (S.D.N.Y. Feb. 13, 2014).

[23]  Accord, e.g., Garner v. Astrue, 08 Civ. 6367, 2009 WL 903742 at *19 (S.D.N.Y. Apr. 6, 2009) (Peck, M.J.), report & rec. adopted in part, 2009 WL 1911744 (S.D.N.Y. June 30, 2009); Gibbs v. Astrue, 07 Civ. 10563, 2008 WL 2627714 at *25 (S.D.N.Y. July 2, 2008) (Peck, M.J.), report & rec. adopted, 2008 WL 4620203 (S.D.N.Y. Oct. 16, 2008); Quezada v. Barnhart, 06 Civ. 2870, 2007 WL 1723615 at *13 (S.D.N.Y. June 15, 2007) (Peck, M.J.); Papp v. Comm'r of Soc. Sec., 05 Civ. 5695, 2006 WL 1000397 at *16 (S.D.N.Y. Apr. 18, 2006) (Peck, M.J.); Rodriguez v. Barnhart, 04 Civ. 4514, 2005 WL 643190 at *12 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); Jiang v. Barnhart, 03 Civ. 0077, 2003 WL 21526937 at *15 (S.D.N.Y. July 8, 2003) (Peck, M.J.), report & rec. adopted, 2003 WL 21755932 (S.D.N.Y. July 30, 2003); Walzer v. Chater, 93 Civ. 6240, 1995 WL 791963 at *11 (S.D.N.Y. Sept. 26, 1995) (Kaplan, D.J. & Peck, M.J.) (citing Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Velk v. Shalala, 93 Civ. 3111, 1995 WL 217516 at *5 (S.D.N.Y. Apr. 11, 1995)).

[24]  A vocational expert can provide evidence regarding the existence of jobs in the economy and a particular claimant's functional ability to perform any of those jobs.  20 C.F.R. §§ 404.1566(e), 416.966(e); see, e.g., Calabrese v. Astrue, 358 F. App'x 274, 275-76 (2d Cir. 2009); Butts v. Barnhart, 416 F.3d 101, 103-04 (2d Cir. 2005); Taylor v. Barnhart, 83 F. App'x 347, 350 (2d Cir. 2003); Jordan v. Barnhart, 29 F. App'x 790, 794 (2d Cir. 2002); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988); Dumas v. Schweiker, 712 F. 2d 1545, 1553-54 (2d Cir. 1983); DeJesus v. Astrue, 762 F. Supp. 2d 673, 693 n.20 (S.D.N.Y. 2011) (Peck, M.J.); Quezada v. Barnhart, 2007 WL 1723615 at *13 n.20; Snipe v. Barnhart, 05
(continued...)

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training." Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).[25/]

> In meeting his burden under the fifth step, the Commissioner:
>
> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir.

---

[24/]   (...continued)
Civ. 10472, 2006 WL 2390277 at *18 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sept. 12, 2006); de Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *17 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Bosmond v. Apfel, 97 Civ. 4109, 1998 WL 851508 at *8 (S.D.N.Y. Dec. 8, 1998); Fuller v. Shalala, 898 F. Supp. 212, 218 (S.D.N.Y. 1995) (The "vocational expert, . . . provided several examples of unskilled . . . jobs that are available in the national and local economies for a person with [plaintiff's] condition, age, education, and work experience. . . . Accordingly, the Secretary satisfied her burden of showing that such jobs exist in the national economy.").

[25/]   See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).  "The Grid classifies work into five

categories based on the exertional requirements of the different jobs.  Specifically, it divides work

into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the

primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling."

Zorilla v. Chater, 915 F. Supp. at 667 n.2; see 20 C.F.R. § 404.1567.  Taking account of the

claimant's residual functional capacity, age, education, and prior work experience, the Grid yields

a decision of "disabled" or "not disabled."  20 C.F.R. § 404.1569; 20 C.F.R., Pt. 404, Subpt. P, App.

2, § 200.00(a).

       However, "relying solely on the Grids is inappropriate when nonexertional limitations

'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address

plaintiff's limitations."  Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July

20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov.

2, 2011) (Peck, M.J.), report & rec. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax

v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole

reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments

'significantly limit the range of work permitted by his exertional limitations.'").

       Rather, where the claimant's nonexertional limitations "'significantly limit the range

of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational

expert."  Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at

605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the

ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact

on a claimant's ability to perform the full range of work, and instead must obtain the testimony of

a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional

impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.'  Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing Bapp)); Suarez v. Comm'r of Soc. Sec., No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting Zabala)).

Using the Grid, a person of Paulino's age (under age fifty-five),[26] education (through third grade) and ability to perform light work, is not disabled for purposes of Social Security benefits.  20 C.F.R., Pt. 404, Subpt. P, App. 2, §§ 202.00(d), 202.10.  Because Paulino also had nonexertional limitations (depression), the ALJ's decision also was supported by vocational expert Cestar's testimony.  (See pages 12-13 above.)  See also 20 C.F.R. §§ 416.945-.969a.  Thus, the ALJ's decision was supported by substantial evidence.

## CONCLUSION

For the reasons discussed above, the Commissioner's motion for judgment on the pleadings (Dkt. No. 23) should be GRANTED.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable

---

[26]  Paulino was 51 years old at the alleged onset of her disability and 53 at the time of the ALJ hearing.  (See page 2 above.)

Analisa Torres, 500 Pearl Street, Room 2210, and to my chambers, 500 Pearl Street, Room 1370.

Any requests for an extension of time for filing objections must be directed to Judge Torres (with a courtesy copy to my chambers).   Failure to file objections will result in a waiver of those objections for purposes of appeal.   Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v. Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:         New York, New York
               May 13, 2014

                              Respectfully submitted,

                              **Andrew J. Peck**
                              United States Magistrate Judge

Copies to:     Martha Paulino (Mail)
               All Counsel (ECF)
               Judge Analisa Torres